1

2

3

4

5

## UNITED STATES DISTRICT COURT
## EASTERN OF WASHINGTON

6

J. MITCH HALL and NATHAN
KAY, on behalf of himself and all
others similarly situated,

NO. 2:15-cv-231-SAB

7

8

                    Plaintiffs,

9

 v.

**PLAINTIFF NATHAN KAY'S
UNOPPOSED MOTION FOR
CONDITIONAL
CERTIFICATION OF
SETTLEMENT CLASS AND
PRELIMINARY APPROVAL OF
SETTLEMENT**

10

L-3 COMMUNICATIONS
CORPORATION, L-3
COMMUNICATIONS VERTEX
AEROSPACE, LLC and L-3
COMMUNICATIONS
INTEGRATED SYSTEMS L.P.,

11

12

WITHOUT ORAL ARGUMENT

13

                    Defendants.

Date: November 30, 2018

14

15

16

17

18

19

20

21

# TABLE OF CONTENTS

INTRODUCTION ................................................................1

PROCEDURAL AND FACTUAL BACKGROUND ............................................2

I.   Procedural Background ................................................2

II.  Factual Background ...................................................3

   A. Background on L-3 and its ISR Programs ...................................4

   B. L-3's Hiring Process for the Senior Pilot I Position ..........................5

   C. Plaintiff's Evidence of L-3's Alleged Pattern or Practice of Discrimination
      Against Reservists .....................................................8

   D. L-3 Denies That it Has Discriminated Against Reservists .........................12

TERMS OF THE SETTLEMENT AGREEMENT ..........................................14

I.   The Settlement Class ..................................................14

II.  Settlement Overview ..................................................15

III. Monetary Relief and Determining Entitlement to Settlement Payments....15

IV.  Programmatic Relief..................................................16

V.   Attorneys' Fees and Costs and Service Awards ..........................18

VI.  Settlement Administration, Claim Forms, and Proposed Distribution .......19

ARGUMENT ................................................................19

I.   Preliminary Approval of the Class Action Settlement is Appropriate ..........19

   A. Certification is Proper Under Rule 23(b)(3) ..............................20

      1.   Numerosity is Satisfied .........................................20

      2.   Commonality Is Satisfied.........................................20

3.    Typicality Is Satisfied ..................................................23

4.    Adequacy is Satisfied..................................................24

B.  The Requirements of Rule 23(b)(3) are Satisfied ........................25

1.    Predominance is Satisfied ..................................................25

2.    Superiority Is Satisfied........................................................26

C.  The Settlement Meets the Preliminary Approval Criteria ..........................27

1.    Plaintiff's Case Faced Significant Risk .................................29

2.    The Settlement Amount Is Appropriate.................................30

3.    The Extent of Discovery Supports the Settlement.................................32

III.    The Settlement Notice and Notice Plan Should be Approved....................32

CONCLUSION ..................................................................33

# TABLE OF AUTHORITIES

**CASES**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................ 20, 27

*Arnett v. Bank of Am., N.A.*,
  No. 11 Civ. 1372, 2014 WL 4672458 (D. Or. Sept. 18, 2014) ........................31

*Arroyo v. Volvo Grp. N. Am., LLC*,
  805 F.3d 278 (7th Cir. 2015) ............................................................11

*Atteberry v. Avantair, Inc.*,
  No. 08 Civ. 1034, 2009 WL 1615519 (M.D. Fla. June 9, 2009) ........................10

*Beattie v. Trump Shuttle, Inc.*,
  758 F. Supp. 30 (D.D.C. 1991)............................................................11

*Beck v. Boeing Co.*,
  203 F.R.D. 459 (W.D. Wash. 2001)............................................... 23, 27

*Beck v. Boeing Co.*,
  60 F. App'x 38 (9th Cir. 2003)................................................... 22, 26

*Bobo v. United Parcel Serv., Inc.*,
  665 F.3d 741 (6th Cir. 2012) ............................................................11

*Brown v. Nucor Corp.*,
  785 F.3d 895 (4th Cir. 2015) ................................................... 22, 23

*Brown v. Union Pac. R.R. Co.*,
  No. 08 Civ. 335, 2009 WL 1110824 (E.D. Ark. Apr. 24, 2009) ........................11

*Collins Foods Int'l, Inc. v. U.S. I.N.S.*,
  948 F.2d 549 (9th Cir. 1991) ............................................................10

Collins v. Cargill Meat Sols. Corp., 274 F.R.D. 294 (E.D. Cal. 2011) ...... 27, 28, 29

*Dunakin v. Quigley*,
  99 F. Supp. 3d 1297 (W.D. Wash. 2015) ..........................................20

*Eichaker v. Village of Vicksburg*,
  627 F. App'x 527 (6th Cir. 2015).........................................................11

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (2012) ..........................................................................21

*Hall v. L-3 Commc'ns Corp.*,
   170 F. Supp. 3d 1316 (E.D. Wash. 2016) ................................... 2, 3, 5

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ........................................... 25, 29

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ..............................................................24

*In Re Heritage Bond Litig.*,
   No. 02 ML 1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005)........................31

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ..............................................................32

*International Brotherhood of Teamsters v. United States*,
   431 U.S. 324 (1977) ...................................................... 21, 26

*Leisek v. Brightwood Corp.*,
   278 F.3d 895 (9th Cir. 2002) ..............................................................11

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ..............................................................26

*Margulies v. Tri-Cnty. Metro. Transp. Dist. of Or.*,
   No. 13 Civ. 00475, 2013 WL 5593040 (D. Or. Oct. 10, 2013) ..........................33

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ..............................................................20

*McLain v. City of Somerville*,
   424 F. Supp. 2d 329 (D. Mass. 2006)..............................................11

*Mills v. Earthgrains Baking Cos., Inc.*,
   No. 03 Civ. 182, 2004 WL 1749500 (E.D. Tenn. July 19, 2004) ......................11

*Murphy v. Radnor Twp.*,
   542 F. App'x 173 (3rd Cir. 2013)........................................................10

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*,
   688 F.2d 615 (9th Cir. 1982)..............................................................31

*Pacheo v. JP Morgan Chase Bank, N.A.*,
  No. 15 Civ. 05689, 2017 WL 3335844 (N.D. Cal. Aug. 4, 2017) ............... 19, 20

*Pfunk v. Cohere Commc'ns, LLC*,
  73 F. Supp. 3d 175 (S.D.N.Y. 2014) ................................................................11

*Rollins v. Traylor Bros.*,
  No. 14 Civ. 1414, 2016 WL 258523 (W.D. Wash. Jan. 21, 2016) .............. 22, 23

*Savage v. Fed. Express Corp.*,
  856 F.3d 440 (6th Cir. 2017) ..........................................................................11

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ........................................................................20

*Torres v. Mercer Canyons, Inc.*,
  305 F.R.D. 646 (E.D. Wash. 2015), aff'd, 835 F.3d 1125 (9th Cir. 2016) ..........24

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ....................................................................................25

*Vaquero v. Ashley Furniture Indus., Inc.*,
  824 F.3d 1150 (9th Cir. 2016) ........................................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................ 21, 22, 23, 26

*Wolin v. Jaguar Land Rover N.A., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ........................................................................27

**STATUTES**

38 U.S.C. § 4301 ..................................................................................................2

38 U.S.C. § 4311(a) .............................................................................................3

**RULES**

Fed. R. Civ. P. 23 ........................................................................................ *passim*

**INTRODUCTION**

Plaintiff Nathan Kay ("Plaintiff"), on behalf of himself and a proposed Class, requests that the Court preliminarily approve the Class Settlement Agreement between Plaintiff and L-3 Communications Corporation, L-3 Communications Vertex Aerospace, LLC, and L-3 Communications Integrated Systems L.P. ("L-3") (collectively, the "Parties").   The Class Settlement Agreement ("Settlement") is fair, reasonable, and adequate, and satisfies the criteria for approval.   Plaintiff requests that the Court: (1) grant preliminary approval of the Settlement, which is attached as Exhibit 1 to the Declaration of Peter Romer-Friedman ("Romer-Friedman Decl.")[1]; (2) conditionally certify the proposed Settlement Class; (3) appoint Plaintiff's counsel as Class Counsel; (4) approve the proposed Court-Authorized Notice and Claim Form ("Notice and Claim Form"), attached as Exhibit C to the Settlement Agreement, and authorize its distribution; and (5) establish a date for the final approval hearing.

L-3 does not oppose this motion, but it does not agree with or adopt Plaintiff's recitation of the alleged facts or applicable law.  L-3 denies liability and specifically denies it ever discriminated against anyone in its hiring practices.

---

[1] Unless otherwise indicated, all Exhibits are attached to the Romer-Friedman Declaration and all capitalized terms have definitions set forth in the Settlement.

## PROCEDURAL AND FACTUAL BACKGROUND

### I.   Procedural Background

On September 13, 2015, Plaintiffs Joseph "Mitch" Hall and Nathan Kay filed individual claims under the Uniformed Services Employment & Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301 *et seq*.  ECF No. 1.[2]  L-3 filed a motion to dismiss, ECF No. 8, which was denied.  *Hall v. L-3 Commc'ns Corp.*, 170 F. Supp. 3d 1316, 1321 (E.D. Wash. 2016).  Written discovery and discovery-related motion practice ensued.  On February 23, 2017, the Court granted leave to amend the complaint to add class claims on behalf of Plaintiff Kay and other Reservist pilots who were denied employment by L-3.  ECF No. 123.  On March 15, 2017, Plaintiff filed a Third Amended Complaint, ECF No. 128 (hereinafter "Complaint" or "Compl."), which added class-based allegations and claims.  *Id.*

From March 2017 to April 2018, the Parties engaged in robust written and oral discovery, including nine depositions of key witnesses, production of over 65,000 pages of documents, and interviews of dozens of witnesses, resulting in

---

[2] Hall, a former L-3 employee, brought individual claims against L-3 for various employment practices, and did not seek to represent the class.  Hall's claims are not addressed in the Class Settlement between Kay, other applicants, and L-3.  As Hall is not a party to this Class Settlement, any references to "Plaintiff" in this motion refer to Plaintiff Nathan Kay.

declarations from 20 L-3 applicants and employees.  *Romer-Friedman Decl.* ¶ 56. The Parties analyzed tens of thousands of pages of personnel records so that they and their experts could analyze whether the data demonstrated disparities and/or bias in how Reservists were treated.  *Id.* ¶ 57.

After completing nearly all the discovery needed to move for class certification and preparing a class certification motion, Plaintiff joined L-3 in asking the Court to stay the action to explore settlement.  ECF No. 161; Romer-Friedman Decl. ¶ 58.  On April 12, 2018, the Parties engaged in a 13-hour mediation with Carol A. Wittenberg of JAMS in New York City.  Romer-Friedman Decl. ¶ 59.  Ms. Wittenberg has a wealth of experience mediating complex employment class actions.  *Id.*  The Parties reached an agreement in principle at the mediation, which they committed to writing and executed on May 21, 2018.  *Id.* ¶ 60.  Over the next four months, the Parties extensively negotiated a detailed Settlement Agreement and executed the Settlement on October 15, 2018.  *Id.* ¶ 61.

## II.    **Factual Background**

The facts stated below are based on Plaintiff's view of the discovery to date. Although L-3 does not oppose this motion, L-3 does not adopt the facts alleged below.

In this action, Plaintiff Kay brings discrimination claims under USERRA, 38 U.S.C. § 4311(a), on behalf of all noncareer members of the National Guard and Reserves ("Reservists") who applied for and were denied the Senior Pilot I position

1 in L-3's Intelligence, Surveillance, and Reconnaissance ("ISR") programs.  Compl.

2 ¶ 1.1.  Kay alleges that Reservists were subjected to a general pattern or practice of

3 discrimination due to their ongoing military service or obligations.  *Id.* ¶¶ 1.3-4

### A. Background on L-3 and its ISR Programs

5 L-3 Communications Corp. (now called "L3 Technologies") is the thirteenth

6 largest American defense contractor and a prime contractor in ISR systems, aircraft

7 sustainment, simulation and training, and detection systems.  Romer-Friedman

8 Decl. ¶ 19.  L-3's customers include federal defense, intelligence, and homeland

9 security agencies.  *Id.* ¶ 20.  L-3 operates many of its businesses through wholly

10 owned subsidiaries, including L-3 Vertex Aerospace ("L-3 Vertex") and L-3

11 Communications Integrated Systems ("L-3 CIS"), which collectively employed

12 hundreds of ISR pilots since 2011.  *Id.* ¶ 21.

13 L-3's ISR programs and employees, including pilots, provide support for

14 military intelligence activities, especially in the Middle East and South Asia.  *Id.* ¶

15 22.  L-3's Program Management Office ("PMO") staff based in northeast Texas

16 supervise L-3's ISR pilots, and the PMO staff of every ISR program consist of a

17 Program Manager, an Operations Manager, a Chief Pilot, Chief Operator, and Chief

18 Maintainer.[3]  *Id.*  Each ISR program's staff is supported by a deployment

19

20 [3] Originally, L-3 Vertex operated L-3's ISR Programs out of offices in northeast

21 Texas and Mississippi.  In October 2014, all but one ISR Program, MARSS, were

coordinator/scheduler who creates and manages pilots' schedules.  *Id.*

## B. L-3's Hiring Process for the Senior Pilot I Position

To staff military contracts, L-3's ISR programs have routinely employed hundreds of Senior Pilot I pilots.  *Id.* ¶ 24.  The Senior Pilot I position is a "line pilot" or basic pilot position, the entry point for most pilots who want to work for L-3's ISR programs, and the most common pilot position.  *Id.*  In every ISR program, Senior Pilot I pilots do the same basic type of work.  *Id.*  ¶ 25.  Senior Pilot I pilots across all ISR programs fly the same aircraft, the Beech King Air 350.  *Id.* ¶ 26.

For most of 2011 to 2018, L-3's ISR programs have maintained the same basic criteria for hiring Senior Pilot I pilots.  *Id.* ¶ 27.  For the Senior Pilot I position, applicants have been required to have at least 2,000 total flight hours and 500 hours of fixed wing multi-engine ("ME") time (though from March 2016 to March 2017, the total hour requirement was 1,500 hours).  *Id.* ¶ 28.  There also have been "preferred" qualifications for instrument time, turbine time, cross country time, and pilot in command time.  *Id.* ¶ 29.  Candidates still could be hired with fewer than 2,000 total flight hours if they had other relevant experience.  *Id.*

---

transferred to L-3 CIS and have been operated out of offices in North Texas.  L-3 Vertex continued to operate MARSS out of Mississippi until February 2016, when L-3 Vertex ceased operating ISR Programs.  *Id.* ¶ 23.

Plaintiff alleges that L-3's ISR programs have had a centralized process for recruiting and hiring pilots. *Id.* ¶ 30. During most time periods since 2011, two to three recruiters or hiring coordinators and four to six chief pilots have been primarily responsible for hiring decisions. *Id.* ¶ 31. L-3's hiring of Senior Pilot I pilots has generally included an initial review step, a hiring team review step, an interview, and then a hire recommendation. *Id.* ¶ 32. Candidates have been required to submit online applications for the Senior Pilot I position. *Id.* ¶ 33. In doing so, they answer standard questions about prior jobs and education, and they submit their cover letters and resumes. *Id.*

Two to three recruiters conduct an initial review of applications. *Id.* ¶ 34. Recruiters work closely with chief pilots across all ISR programs to assess the programs' needs and eliminate unqualified candidates. *Id.* The purpose of the initial review is often to identify applicants who meet the minimum criteria, limiting the number of applications chief pilots review and interview. *Id.* ¶ 35.

An applicant who survives the initial review moves onto the hiring team review. *Id.* ¶ 36. Prior to 2015, recruiters conducted the initial review and moved those selections to the hiring team review step, where the chief pilot decided whether to conduct an interview. *Id.* ¶ 37. After the creation of the hiring team coordinator role in early 2015, recruiters have reviewed resumes to determine whether candidates meet the position's basic qualifications and then the hiring team coordinator has reached out to applicants. *Id.* ¶ 38.

The hiring coordinator's outreach has involved a pre-screen e-mail that asks about the applicant's military separation date and for written documentation on the person's separation from the military. *Id.* ¶ 39. When applicants provided such information to the hiring coordinator, the hiring coordinator recorded the applicant's military status—for example, as "Civilian," "Reserves," "Retired [from military]," or "currently on terminal [leave from military]." *Id.* ¶ 40.

   

Chief pilots have made decisions about whom to interview based on the applications filtered by the recruiters or hiring coordinator. *Id.* ¶ 41. Before 2015, the chief pilot conducted interviews and determined whether to recommend the hiring of an applicant to the program manager. *Id.* During interviews, some chief pilots recorded their notes in documents called "pilot interview worksheets." *Id.* In the pilot interview worksheets, some decision-makers obtained and recorded information about applicants' military status or service, including when applicants would retire from the military and whether they were reservists or civilians, similar to the images directly prior to this paragraph. *Id.* After creating the hiring coordinator role, interviews have been conducted by the chief pilot, hiring coordinator, and operations manager. *Id.* ¶ 42.

Large percentages of all Senior Pilot I applicants have been removed from the application pool at the initial review and hiring team review stages. *Id.* ¶ 43.

But over 97% of persons interviewed were recommended for hire. *Id.* The decision to recommend a Senior Pilot I for hire has always rested on the chief pilot of the relevant ISR program. *Id.* ¶ 44. The chief pilot has completed a standard form used across all ISR programs called a "hire recommendation form" and submitted it to the program manager for approval of a new hire. *Id.* Often the chief pilot would make remarks on the applicants' military status or service in the hire recommendation form. *Id.* Program managers usually approve chief pilots' hiring recommendations, such that the vast majority of those who make it to the interview stage are offered a position. *Id.*

### C.    Plaintiff's Evidence of L-3's Alleged Pattern or Practice of Discrimination Against Reservists

Through extensive discovery, Plaintiff alleges that there is evidence to show that L-3 had a pattern or practice of discrimination against Reservists, including evidence that (1) L-3 expressly documented and considered the military status and obligations of Reservists in the hiring process, (2) Reservists were treated less favorably than veterans in the first two steps of the hiring process, (3) L-3 managers found it inconvenient to schedule Reservists for work when they took military leave and found applicants less attractive if their military duty interfered with L-3's work schedules, and (4) L-3 employees complained about hostility towards Reservists who took leave that interfered with their L-3 work. *Id.* ¶ 45. L-3 denies such allegations as detailed below. While L-3 does not oppose this motion, it denies the facts as alleged in this section.

In general, Plaintiff alleges that Reservist and veteran pilot applicants to L-3's ISR programs had similar professional experiences and were ideal candidates for the Senior Pilot I position, due to high flight hours, combat flying experience, comfort working with the military, and active security clearances. *Id.* ¶ 46. Due to this experience, most of L-3's ISR pilots had military backgrounds, and both Reservists and veterans were hired at a higher rate than civilian applicants for the Senior Pilot I position. *Id.* ¶ 47. But when L-3 considered applicants with military experience (Reservists or veterans), Plaintiff alleges that statistical evidence supports its assertion that L-3 had a practice of preferring veterans who lacked ongoing military obligations over Reservists who would be routinely called to military duty and be more likely than veterans to have military duty interfere with their 60-day work rotations at L-3. *Id.*

Plaintiff has identified evidence on the following practices, based on over 65,000 pages of documents produced by the Parties, declarations of Class Members and L-3 employees, nine depositions, and Plaintiff's expert's statistical analysis of disparities between Reservists and veterans in L-3's hiring process. *Id.* ¶ 48.

First, Plaintiff alleges that L-3 officials inquired into the military status or service of applicants and documented such information in interview worksheets and pre-interview emails used by the very same people making hiring decisions. *Id.* ¶ 49. In recent years, applicants had to provide information on their military status to move beyond the pre-screening process and obtain an interview. *Id.*

Inquiring into an applicant's military service, including whether he or she has ongoing military obligations, may show an employer's bias in hiring. *Atteberry v. Avantair, Inc.*, No. 08 Civ. 1034, 2009 WL 1615519, at *4 (M.D. Fla. June 9, 2009) (prima facie case of hiring discrimination met where employer asked "'how much longer he had'" in reserves); *Murphy v. Radnor Twp.*, 542 F. App'x 173, 178 (3rd Cir. 2013) (decision not to hire reservist found to be motivated by military service as employer inquired into "military obligations"). Under similar anti-discrimination laws, "pre-employment inquiries concerning a job applicant's" protected status "may constitute evidence of discrimination." *Collins Foods Int'l, Inc. v. U.S. I.N.S.*, 948 F.2d 549, 552 (9th Cir. 1991) (internal citation and quotations omitted).

Second, Plaintiff alleges that Reservists were disfavored vis-à-vis veterans because their military duty might conflict with their 60-day L-3 work rotations. Romer-Friedman Decl. ¶ 50. For example, Plaintiff asserts evidence shows (1) a L-3 hiring official told a Reservist applicant in an interview that L-3 expected this pilot to perform his military duty when he was not scheduled for work at L-3; (2) a high-ranking L-3 official testified he would tell an applicant who cannot always work his 60-day work rotation at L-3—which includes many Reservists— he should not apply for the Senior Pilot I position; (3) Reservists hired by L-3 perceived that they were expected to schedule military leave to avoid conflicts with their L-3 work schedules and consequently lost work opportunities at L-3; (4) and Reservists believed L-3 managers were frustrated when they frequently took

voluntary military leave or leave that conflicted with their L-3 work schedules. *Id.*

Bias may be shown by asking or requiring an employee to schedule military duty on days when he or she is not working, *Mills v. Earthgrains Baking Cos., Inc.*, No. 03 Civ. 182, 2004 WL 1749500, at *4-5 (E.D. Tenn. July 19, 2004) (bias where employer directed employee to "use his day off . . . to complete his weekend drills"), by imposing restrictions on a reservist taking leave does, *Leisek v. Brightwood Corp.*, 278 F.3d 895, 900 (9th Cir. 2002), or by expressing frustration about taking various types of military leave. *See, e.g.*, *Savage v. Fed. Express Corp.*, 856 F.3d 440, 449 (6th Cir. 2017); *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 285 (7th Cir. 2015); *Eichaker v. Village of Vicksburg*, 627 F. App'x 527, 532 (6th Cir. 2015); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 756 (6th Cir. 2012); *Pfunk v. Cohere Commc'ns, LLC*, 73 F. Supp. 3d 175, 190 (S.D.N.Y. 2014); *Brown v. Union Pac. R.R. Co.*, No. 08 Civ. 335, 2009 WL 1110824, at *2-5 (E.D. Ark. Apr. 24, 2009).

Third, Plaintiff alleges that certain Reservists were not hired by L-3 because they were on reserve duty when they applied for the Senior Pilot I position. Romer-Friedman Decl. ¶ 51. Refusing to hire or consider a reservist because he or she may be unavailable to start a job at a certain time may show bias. *McLain v. City of Somerville*, 424 F. Supp. 2d 329, 333 (D. Mass. 2006) (employer engaged in discrimination by declining to hire person whose military service would end weeks after start of police academy, and discussing *Beattie v. Trump Shuttle, Inc.*, 758 F.

Supp. 30, 31-34 (D.D.C. 1991) (employer discriminated by refusing to hire reservist as his reserve duty prevented him from starting job on the employer's desired date)).

Fourth, Plaintiff's counsel and their expert conducted a detailed analysis of personnel files and hiring data L-3 produced, applying two different methodologies—one that compared the success rate of each application and another that compared the success rate of each person's collective applications to be hired once—to find that Reservists were treated less favorably than veterans at the first two steps of the hiring process, and if Reservists had advanced at the same rate as veterans dozens of additional Reservists would have been hired for the Senior Pilot I position from 2011 to 2018.  Romer-Friedman Decl. ¶ 52.

After analyzing tens of thousands of pages of application files to determine which applicants were reservists, veterans, and civilians when they applied for the Senior Pilot I position, Plaintiff's counsel and expert determined that veterans were hired at a substantially greater rate than Reservists and veterans' applications were significantly more likely to be successful than Reservists' applications.  They determined that if Reservists and veterans had been hired at the same rate, between 20 and 35 additional Reservists would have been hired from 2011 to 2018 for the Senior Pilot I position.  *Id.* ¶ 53.

### D.    <u>L-3 Denies That it Has Discriminated Against Reservists</u>

Throughout this litigation, L-3 has vigorously denied that it discriminated against Reservists and maintains that it has consistently hired the most qualified

applicants regardless of their military status. Among other things, L-3's expert opined based on the same statistical evidence that L-3 hired Reservists at a greater rate than either veterans or civilians. Both Plaintiff's and L-3 experts agreed that Reservists were hired at a greater rate than non-Reservists (even though Plaintiff's expert concluded that veterans were hired at a greater rate than Reservists). Thus, L-3 asserts that it did want to hire Reservists due to their relevant experience.

L-3 disagreed with Plaintiff's statistical analyses. First, L-3 took issue with the first methodology that compared applications (as opposed to applicants) because some applicants applied many times, as opposed to one time. Second, L-3 and Plaintiff had significant differences in which applicants they identified as being Reservists, veterans and/or civilians at the time that they applied for the Senior Pilot I position. These differences were responsible for the lion's share of differences between the Parties' conclusions on disparities between Reservists and other applicants. Third, L-3 disagreed with any analysis that generally compares all veterans to all active Reservists, given that many veterans have been out of the military for many years and have more experience than Reservists. Thus, L-3 believes it is possible that even if a discrepancy existed between the hiring rates of veterans and Reservists, it could be explained by reasons other than discrimination, such as differences in experience levels between the two groups. The Parties agree that L-3 has hired a significant number of Reservists for Senior Pilot I positions during the class period, but Plaintiffs believe that more Reservists would have been

hired in the absence of bias.

Accordingly, L-3 strongly denies having any general pattern or practice of discriminating against Reservists in hiring. Rather, L-3 contends that all pilot applicants were offered positions or denied positions based on the merits of their credentials. Further, L-3 denies that its hiring team inquired into applicants' military status for the purposes of discriminating against them. Rather, L-3 claims that it only asked about applicants' military status because L-3 was forbidden from hiring active duty military members. L-3 also denies that it had a policy or practice of hostility toward Reservists.

L-3 further denies that it had a policy or practice of requiring pilots to conduct their military duty during their rest and recuperation period, disagrees with Plaintiff's analysis of the evidence that Plaintiff identified on this subject, and does not believe that such evidence would support a finding of bias in hiring.

## TERMS OF THE SETTLEMENT AGREEMENT

### I.    The Settlement Class

The Parties agreed to certify a Settlement Class under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, defined as "all persons who applied for a Senior Pilot I position with one or more of Defendants' ISR Programs during the Settlement Class Period of January 1, 2011 through the date of the Motion for Preliminary Approval ("the Settlement Class Period"), who at the time of their applications were active or current Reservists during the Settlement Class Period,

and were not hired by any Defendant in a Senior Pilot I position during the Settlement Class Period." Settlement § IV.1.  Plaintiff estimates there are 200 to 250 Class Members.  Romer-Friedman Decl. ¶ 65.

## II.   Settlement Overview

The Settlement Agreement provides both monetary and programmatic relief. L-3 will pay $2 million to compensate the Class Members for lost wages and to pay for attorneys' fees and costs, service awards, and any relevant taxes.  Settlement § VI.1.  In addition to the $2 million payment, L-3 will pay for the full cost of providing notice to the Class, adjudicating the Claim Forms submitted by Class Members, and other settlement administration tasks. *Id.* § VI.3.  Furthermore, L-3 will adopt a number of modifications intended to enhance its practices for the benefit of Reservists who apply to work for L-3 and who secure employment at L-3. *Id.* § VI.2; Exhibit D to the Settlement ("Programmatic Changes").

## III.   Monetary Relief and Determining Entitlement to Settlement Payments

The Settlement requires L-3 to pay $2 million (the "Cash Settlement Amount") into a Settlement Fund, which will pay for: (a) lost wage payments to Class Members who file successful Claim Forms; (b) Service Awards to Class Representatives, subject to Court approval; (c) attorneys' fees and costs, subject to Court approval; and (d) applicable taxes.  Settlement § VI.1.  After fees, costs, service awards, and certain taxes are paid, persons who file successful Claim Forms showing that they are Class Members and were qualified for the Senior Pilot I

position will receive equal shares of the Settlement Fund. *Id.* §§ VIII.4, X.1-2.

To obtain a Settlement payment, persons must submit Claim Forms with the Settlement Administrator to provide evidence that they are Class Members—they were Reservists when they applied for a Senior Pilot I position and were not hired—and that they were qualified to be a Senior Pilot I during the Class Period. *Id.* § X.3. To file a completed Claim Form, Class Members must state the relevant information in their Claim Forms and supply documentary evidence to support their statements. *Id.* § X.2. It is necessary for Class Members to show their Class membership and qualifications, as there are not comprehensive records on which applicants were Reservists or were qualified. Romer-Friedman Decl. ¶ 67.

## IV.    **Programmatic Relief**

L-3's division that currently employs pilots in ISR programs, L-3 CIS, has agreed to implement a range of policies to enhance the opportunity of Reservists. Settlement § VI.2; Programmatic Changes. These programmatic changes will reform and/or clarify L-3's practices for the benefit of Reservists who apply to work at L-3 or are employed by L-3 and seek to balance their L-3 and military duties. *See* Programmatic Changes. Plaintiff believes the programmatic relief represents an important commitment by L-3 to ensure that Reservists are treated equally, and that the reforms will expand opportunity for hundreds of Class Members and other Reservists. Romer-Friedman Decl. ¶ 68.

The programmatic relief will bar L-3 from making inquiries into military

status before an offer is made, establish greater training on USERRA and military leave, no longer require or expect Reservists to take military leave during time off from L-3, and reform L-3's scheduling policies to make it easier for employees to take military leave and maximize their L-3 work and pay.  Programmatic Changes. As described in Exhibit D to the Settlement, L-3 CIS will take the following steps as part of the programmatic relief:

1.   L-3 CIS will create a policy on USERRA rights as either a standalone policy or within an appropriate Human Resources policy. The USERRA policy will address the military status and service of applicants and employees.

2.   L-3 CIS will not inquire into an applicant's military status or ask an applicant to disclose his military status before making a conditional offer of employment to the applicant.

3.   L-3 CIS will not require employees who go on rotations outside of the Continental United States ("rotators") to schedule their reserve military duty during their periods of rest and recuperation.

4.   L-3 CIS employees will not be required to give the company written notice of military leave before they take military leave.  Oral notice will be sufficient.

5.   L-3 CIS will reform its scheduling policies to increase the amount of work that rotators can perform for L-3 CIS in conjunction with any military leave that they take, including accelerating the time period to return to work after military leave, allowing rotators to work shifts that are 45 days long (and in some cases shorter than 45 days) rather than missing a shift altogether if military leave will interfere with a portion of a rotation, and allowing rotators who work with the company's human resources department to adjust future rotations in light of the rotator's expected return from military leave.

6.   L-3 CIS will train its Human Resources employees and designated L-3 personnel regarding the CIS USERRA policy and its

implementation.

7. L-3 CIS will conduct annual training on USERRA and other reservist issues for human resources and program staff who work with reservists on their military leave or who work on recruitment and hiring, and will modify equal employment opportunity training materials to refer to military service or status as protected classes.

Exhibit D, Programmatic Changes.

## V.    Attorneys' Fees and Costs and Service Awards

Under the Settlement, Class Counsel may request attorneys' fees and costs of up to $650,000, subject to Court approval. Ex. 1, § XI.1. The amount of attorneys' fees that Class Counsel will request is substantially smaller than Class Counsel's lodestar in pursuing the class claims. Romer-Friedman Decl. ¶ 69. In this action, Class Counsel interviewed dozens of witnesses, reviewed and analyzed tens of thousands of pages of documents, undertook an exhaustive analysis of personnel data, conducted extensive legal and factual research, took or defended nine depositions, zealously represented the Class during mediation and post-mediation settlement talks, and otherwise aggressively litigated the case. *Id.* ¶¶ 55-61.

The Settlement allows for Service Awards for Class Representatives in the following amounts: $20,000 for Nathan Kay, $10,000 for Adam Richter, and $10,000 for Stephen Leary. Settlement § XI.2. These payments are separate from any other recovery they are entitled to as Class Members and will compensate them for the significant time they spent prosecuting the case for the Class. Romer-Friedman Decl. ¶ 70.

## VI.    Settlement Administration, Claim Forms, and Proposed Distribution

Under the Settlement, a professional and experienced Settlement Administrator will manage the Settlement Fund, distribute the Notice and Claim Form, adjudicate the Claim Forms to decide which persons are eligible to receive payments, distribute the settlement payments, withhold and remit any tax payments, and otherwise administer the Settlement.  Settlement §§ II.1, V.1, VIII.4.

L-3 will pay the Settlement Administrator's fees and costs, in addition to the $2 million Cash Settlement Amount, and will pay L-3's share of any payroll taxes that are owed on payments to Class Members.  *Id.* §§ VI.1, VI.3.  Notice will be provided to all applicants for the Senior Pilot I position during the Class Period, and Class Members will have an opportunity to object to the Settlement or to opt out of the Class and the Settlement.  *Id.* §§ XII.1; Ex. B, Notice and Claim Form.

## ARGUMENT

## I.    Preliminary Approval of the Class Action Settlement is Appropriate

"Rule 23(e) directs the Court to examine the proposed settlement and make a preliminary finding of fairness," with courts applying a strong judicial policy in favor of class settlements.  *Pacheo v. JP Morgan Chase Bank, N.A.*, No. 15 Civ. 05689, 2017 WL 3335844, at *2 (N.D. Cal. Aug. 4, 2017).  When a class has not yet been certified, courts will conditionally certify a class based on Rule 23's standards, grant preliminary approval, and authorize class notice to the class if "the proposed settlement (1) appears to be the product of serious, informed, noncollusive

negotiations, (2) has no obvious deficiencies, (3) does not improperly grant preferential treatment to class representatives or segments of the class, and (4) falls with the range of possible approval." *Id.*

## A.   Certification is Proper Under Rule 23(b)(3)

Class certification is appropriate where the party seeking certification shows the four requirements of Rule 23(a) and one of Rule 23(b)'s prongs is met.  Fed. R. Civ. P. 23(a)-(b); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997).

### 1.   Numerosity is Satisfied

Rule 23(a) requires members of the class to be so numerous that joinder is impracticable.  Fed. R. Civ. P. 23(a)(1). "Generally, 40 or more members will satisfy the numerosity requirement." *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1326-27 (W.D. Wash. 2015).  Here, Plaintiff estimates there are 200 to 250 Class Members.  Romer-Friedman Decl. ¶ 65.  Thus, numerosity is readily satisfied.

### 2.   Commonality Is Satisfied

Commonality poses a "limited burden" as it "only requires a single significant question of law or fact." *Mazza v. Am. Honda Motor Co., Inc*., 666 F.3d 581, 589 (9th Cir. 2012); *accord Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) ("To satisfy Rule 23(a)(2) commonality, '[e]ven a single [common] question' will do.") (internal citation and quotations omitted). Commonality "means that the class members' claims must depend upon a common contention and that the common contention, moreover, must be of such a

nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1153 (9th Cir. 2016) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks omitted)).

This action raises many legal and factual central questions common to all members of the Proposed Class. Plaintiff's pattern or practice discrimination claim alleging disparate treatment of Reservists raises the common question of whether bias against Reservists was L-3's "standard operating procedure," to be shown via "significant proof" that L-3 "operated under a general policy of discrimination." *Dukes*, 564 U.S. at 352-53 & n.7. The question of whether L-3 had a general policy of discrimination against Reservists is capable of class wide resolution, and will determine whether Plaintiff can meet his prima facie case of discrimination and whether liability may be imposed on L-3 for a pattern or practice of discrimination.

In a pattern or practice case like this, plaintiffs may rely upon a "bifurcated, burden-shifting structure" adopted by the Supreme Court in *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 360-62 (1977). *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 505 (2012). Under that approach, plaintiffs first establish a prima facie case of discrimination by showing the company's standard operating procedure was discrimination, which creates a rebuttable inference that all class members were adversely affected by the discriminatory practice. Then, a

"district court must usually conduct additional proceedings . . . to determine the scope of individual relief," with the burden shifting to the employer to prove that it did not discriminate against each plaintiff. *Dukes*, 564 U.S. at 366-67.

To make out a prima facie case and establish liability in a pattern or practice case, a plaintiff must show "significant proof" that an employer "operated under a general policy of discrimination." *Id.* at 353. "Significant proof of such a policy can be shown entirely through statistics and anecdotal evidence that demonstrate a pattern of discrimination . . . even where the pattern is the result of discretionary decision-making." *Rollins v. Traylor Bros.*, No. 14 Civ. 1414, 2016 WL 258523, at *7 (W.D. Wash. Jan. 21, 2016) (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015) (internal quotation marks omitted)); *see Beck v. Boeing Co.*, 60 F. App'x 38, 39 (9th Cir. 2003) ("*Beck II*") (prima facie case may be shown via "statistics alone").

Plaintiff alleges that the evidence here would be sufficient to make out a prima facie case and offers common factual evidence to support a general policy of discrimination. The evidence includes: (1) statistical evidence on the rate of hiring Reservists; (2) documentary and testimonial evidence that L-3's national pilot hiring process was uniform and carried out by a small group of decisionmakers who were located in one (or at most two) offices; (3) documentary and testimonial evidence that L-3 requested and considered the military status and service of applicants in hiring, L-3 officials disfavored Reservist applicants whose military duty would

conflict with L-3 work schedules, and L-3 officials expected Reservists to fit military leave into their time off from their L-3 work.  Romer-Friedman Decl. ¶ 63.

Other courts have relied on the same types of evidence to support commonality for class disparate treatment claims.  *Rollins*, 2016 WL 258523, at *7-10 (commonality satisfied by substantial anecdotal evidence of bias and statistical evidence of disparities); *Nucor*, 785 F.3d at 914 ("[T]he workers' statistical and anecdotal evidence, especially when combined, thus provide precisely the 'glue' of commonality that *Wal-Mart* demands."); *Beck v. Boeing Co.*, 203 F.R.D. 459, 464 (W.D. Wash. 2001) ("*Beck I*"), *aff'd in part, vacated in part on other grounds*, 60 F. App'x 38 (9th Cir. 2003) ("[S]tatistically significant results of adverse impacts on female employees in every facility and at every level within the Puget Sound area . . . establishes sufficient indicia of classwide disparate treatment to satisfy the certification criteria of commonality and typicality.").  Moreover, L-3's centralized, uniform national hiring process for ISR pilots, carried out by a small group of L-3 officials in one or two locations, stands in stark contrast to *Dukes*, where plaintiffs challenged decisions made by "thousands of managers" nationwide.  *Dukes*, 564 U.S. at 345.

### 3.   **Typicality Is Satisfied**

Typicality requires that "the claims or defenses of the representative parties are typical of the claims . . . the class," Fed. R. Civ. P. 23(a)(3), and considers "whether other members have the same or similar injury, whether the action is based

on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Here, typicality is satisfied, as each Class Member challenges the same conduct and has the same injury: being denied a Senior Pilot I position based on reserve status or service, which caused them to lose income.

### 4.    <u>Adequacy is Satisfied</u>

Rule 23 requires a plaintiff to fairly and adequately protect the class' interests. Fed. R. Civ. P. 23(a)(4). "The test for adequacy is (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the entire class." *Torres v. Mercer Canyons, Inc.*, 305 F.R.D. 646, 653 (E.D. Wash. 2015), *aff'd*, 835 F.3d 1125 (9th Cir. 2016) (citation and internal quotations omitted).

Neither Plaintiff nor his counsel has any such conflict. Plaintiff is a Reservist who applied for and was denied a Senior Pilot I position at L-3, and thus has the same interests – in justice, compensation for lost income, and reform of the company – as other Reservists who were denied the same position by L-3.

Plaintiff's counsel include experienced litigators who focus on protecting reservists' USERRA rights, including Matthew Crotty and Thomas Jarrard who were reservists, and lawyers from Outten & Golden LLP, a leading plaintiff-side employment law firm. Romer-Friedman Decl. ¶ 8; Declaration of Matthew Crotty ¶ 4; Declaration of Thomas Jarrard ¶¶ 3-4; Declaration of Michael Love ¶¶ 5, 10.

Mr. Crotty, Mr. Jarrard, and Mr. Romer-Friedman of Outten & Golden have litigated and settled four of the largest settlements in USERRA's history, including: (1) a USERRA settlement worth up to $19 million for over 1,500 Southwest Airlines pilots in *Huntsman v. Southwest Airlines Co.*, No. 17 Civ. 3872 (N.D. Cal.); and (2) a settlement worth nearly $15 million for nearly 900 Washington State Patrol officers in *Martin v. State of Washington*, No. 14 Civ. 00016 (Wash. Sup. Ct.); *see* Romer-Friedman Decl. ¶ 8.

### B.    The Requirements of Rule 23(b)(3) are Satisfied

### 1.    Predominance is Satisfied

Rule 23(b)(3) requires that "common questions predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation and internal quotations omitted). Predominance is met when common questions "present a significant aspect of the case and . . . can be resolved for all members of the class in a single adjudication." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citation and internal quotations omitted).

Here, numerous common questions regarding both liability and damages predominate over individual issues. As described above, in Plaintiff's view the evidence and allegations demonstrate a pattern or practice of discrimination against

reservist applicants, including statistical, direct, and anecdotal evidence, and, if accepted by the Court, that evidence could establish a prima facie case of discrimination. Thus, Plaintiff raises common factual and legal issues that overwhelm any individualized issues. And any individual issues on whether specific Class Members were subjected to discrimination may be adjudicated in a *Teamsters* hearing after a class-wide liability hearing. *See Dukes*, 564 U.S. at 352 n.7, 366.

Furthermore, when a plaintiff relies on the *Teamsters* burden-shifting approach, "to meet its rebuttal burden, the employer must demonstrate that the plaintiff[']s [] statistical evidence 'is either inaccurate or insignificant,'" yet another common issue; and the employer "cannot defeat class certification at the liability phase by arguing that it is entitled to introduce individualized evidence that each of its employment decisions was motivated by a legitimate nondiscriminatory reason." *Beck II*, 60 F. App'x at 39 (quoting *Teamsters*, 431 U.S. at 360).

Finally, calculating Class Members' damages does not defeat predominance, especially since here Plaintiff may rely on a common methodology to determine damages. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) ("damage calculations alone cannot defeat certification") (citation and internal quotation marks omitted).

### 2.    <u>Superiority Is Satisfied</u>

Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3). Superiority "requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." *Wolin v. Jaguar Land Rover N.A., LLC*, 617 F.3d 1168, 1175-76 (9th Cir. 2010).

Here, superiority is met. First, there is currently no other similar litigation against L-3. Fed. R. Civ. P. 23(b)(3)(B). Second, Class Members have a modest interest in pursuing individual actions, and they would likely fare far better in a class action. Fed. R. Civ. P. 23(b)(3)(A). While some Class Members might be able to recover tens of thousands of dollars or more in an individual action, the claims may still be "the kind of 'negative value' individual lawsuits which these plaintiffs . . . would be unable to pursue on their own; *i.e.*, the cost of prosecuting them would likely exceed the potential income to any prospective attorney." *Beck I*, 203 F.R.D. at 466. Third, it is ideal to litigate a pattern or practice claim in one forum where all Class Members can benefit from a class-wide decision that they were subjected to a general policy of discrimination. Fourth, the manageability of a class action need not be considered where, as here, a class is certified for settlement purposes. *Amchem*, 521 U.S. at 620.

## C.     The Settlement Meets the Preliminary Approval Criteria

The Settlement Agreement easily satisfies the test that courts apply to determine whether to grant preliminary approval. *See Collins v. Cargill Meat Sols. Corp.*, 274 F.R.D. 294, 301-02 (E.D. Cal. 2011).

First, the Settlement is "the product of serious, informed, non-collusive negotiations." *Id.* at 301. The Parties engaged in extensive discovery to inform themselves on the strengths and weaknesses of the claims, defenses, and potential damages. Romer-Friedman Decl. ¶ 55. They completed enough discovery for Plaintiff to move for class certification in a case with over 65,000 pages of documents and dozens of witnesses. *Id.* ¶¶ 56, 58. Before the settlement talks, the Parties and their experts analyzed years of personnel records and estimated potential damages based on methodologies they developed. *Id.* ¶ 57. All told, the Parties engaged in over two years of extensive discovery. *Id.* ¶ 55. The 13-hour mediation was intensive and lengthy, and was supervised by an experienced mediator. *Id.* ¶ 59. And the Settlement was negotiated by experienced counsel. *Id.* ¶¶ 6-8.

Second, the Settlement has no obvious deficiencies. *Collins*, 274 F.R.D. at 301. The Settlement is a 54-page, comprehensive agreement that resolves complex claims of over 200 Reservists for L-3's alleged failure to hire them due to military status or service. It identifies how the $2 million Cash Settlement Amount will be distributed to Class Members—after payment of fees, cost, service awards, and any taxes—who were allegedly harmed by L-3's alleged bias. Settlement § VI.1. The Settlement also requires L-3 to undertake programmatic changes to benefit hundreds of reservist applicants and employees.

Third, the Settlement does not provide any improper preferential treatment to the Class Representatives or any segments of the Class. *Collins*, 274 F.R.D. at 301-

02. All Class Members who submit completed Claim Forms, including the three proposed Class Representatives, will receive equal shares of the Settlement Fund.

Finally, the Settlement "falls well within the range of possible approval," *id.* at 302, as it provides excellent relief to the Class when considering the major risks in this action. *Hanlon*, 150 F.3d at 1026 (affirming approval of settlement that allowed plaintiffs to avoid the risks of losing their claims in litigation).

In assessing this factor, courts weigh the issues that are considered in greater detail at the final approval stage, such as: (1) "the strength of the plaintiffs' case," "the risk, expense, complexity, and likely duration of further litigation," and "the risk of maintaining class action status throughout the trial," (2) "the amount offered in settlement," (3) "the extent of discovery completed and the stage of the proceedings," and (4) "the experience and views of counsel." *Id.* at 1026.

### 1.    <u>Plaintiff's Case Faced Significant Risk</u>

While Plaintiff believes the Class Members' claims are strong and based on compelling evidence, Plaintiff and the Class would face significant risks due to the inherent complexity of litigating a nationwide pattern or practice case and unique features of this case. Romer-Friedman Decl. ¶ 64. There are risks that a class will not be certified; that class-wide liability cannot be established, especially given that L-3's expert found no disparities that disadvantaged Reservists; that damages awarded could be far less than the $2 million Settlement figure; and that the Court might not order the programmatic changes Plaintiff secured here. *Id*. Moreover,

absent a settlement, L-3 was prepared to litigate many factual and legal questions that could impact liability, class certification, and damages, such as differences between L-3's ISR programs across multiple companies, a statistical advantage maintained by Reservists as compared to civilians (and veterans according to L-3's expert analysis), and the individual qualifications of Reservist applicants.

### 2.   The Settlement Amount Is Appropriate

The monetary amount L-3 will pay—$2 million plus the cost of administering the settlement—is a favorable recovery, particularly due to significant risks the Class would face, and in light of the programmatic reforms the Settlement secures. Indeed, as described above, L-3 claims that Reservists face no bias, denies liability, and would argue based on statistical evidence that no damages are owed. *Supra* § I.C.1.

When applying the methodology described above—with L-3 and Plaintiff's designations of applicants' military status—Plaintiff estimated an additional 20 to 35 Reservists would have been hired for Senior Pilot I positions if Reservists and veterans had been treated equally.  Romer-Friedman Decl. ¶ 54.  When using the current mid-level pay for the Senior Pilot I position (about $125,000 including hazard pay), an average longevity of Senior Pilot I pilots of 2.833 years, and assuming that pilots on average would mitigate 80% of lost wages via alternative

employment,[4] the loss of income for 20 to 35 pilots ranges from $1.4 million to $2.5 million. *Id.* ¶ 66.  In light of these estimates, a $2 million Settlement figure is on the higher end of the range.

Given the major risks the Class faces on liability, damages, and class certification, the Settlement offers strong relief and potentially greater relief than the Class could obtain in protracted litigation. *See In Re Heritage Bond Litig.*, No. 02 ML 1475, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005) (calling a recovery of 23% of the claimed loss after deduction of fees an "exceptional result"); *Arnett v. Bank of Am., N.A.*, No. 11 Civ. 1372, 2014 WL 4672458, at *7 (D. Or. Sept. 18, 2014) (collecting cases approving settlements from 6% to 12% of potential recoveries).  The "[t]he track record for large class action employment discrimination cases demonstrates that many years may be consumed by trial(s) and appeal(s) before the dust finally settles." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 629 (9th Cir. 1982).

---

[4] In 2017, the median annual wage for airline and commercial pilots was $111,930, about 90% of the current mid-level band of pay for L-3 ISR pilots.  Bureau of Labor Statistics, *Airline and Commercial Pilots Summary*, https://www.bls.gov/ooh/transportation-and-material-moving/airline-and-commercial-pilots.htm.

### 3.    The Extent of Discovery Supports the Settlement

The touchstone of the analysis of the extent of discovery is whether "the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation and internal quotations omitted). Here, the extent of the discovery is robust. As described above, before the Parties agreed to discuss settlement, the case was hotly litigated, with numerous motions, nine depositions, over 65,000 pages of documents produced, expert discovery, and many discovery disputes. Romer-Friedman Decl. ¶ 56. The Parties and their counsel had the critical information they needed to value the case and make an informed decision on settlement. The remaining litigation—including written and oral discovery on liability and damages, a class certification motion, expert depositions, and trial—would be protracted, and an appeal would be likely.

For these reasons, the Settlement should be preliminarily approved.

## III.    The Settlement Notice and Notice Plan Should be Approved

The proposed Notice is "reasonable" and the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B) & (e)(1). The Notice and Claim Form are consistent with modern best practices. Romer-Friedman Decl. ¶ 71. They will be disseminated by electronic mail to every Senior Pilot I applicant who was not hired during the Class Period, and if an e-mail address is not available or is returned as undeliverable for such applicants, the notice will be sent via U.S. Mail to them. Ex. 1, Settlement § V.1. In addition, a web site hosted by the Settlement

Administrator will provide information to the potential Class Members. *Id.* § V.3(a).

In recent years, courts have approved dissemination of notice via electronic mail where reliable e-mail addresses are available, and here L-3 has e-mail addresses for nearly all of the applicants, since all of them applied online. *See Margulies v. Tri-Cnty. Metro. Transp. Dist. of Or.*, No. 13 Civ. 00475, 2013 WL 5593040, at *21 (D. Or. Oct. 10, 2013) (approving notice via by e-mail, finding that "email is an efficient and nonintrusive method of communication," and collecting cases).

Finally, consistent with Rule 23(c)(2)(B), the Notice describes the scope of the Class, the terms of the Settlement, how Class Members can exclude themselves from the Class by a specific date, that the judgment will include all Class Members who do not opt out, that any Class Member who does not opt out can appear through their counsel, and how Class Members can object to or comment on the Settlement, among other critical information. *See* Ex. B, Notice and Claim Form.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion should be granted. A proposed order is attached as Exhibit B to the Settlement Agreement.

DATED this 30th day of October, 2018.

*/s/ Peter Romer-Friedman*
Peter Romer-Friedman *(pro hac vice)*
OUTTEN & GOLDEN LLP
601 Massachusetts Ave NW, Suite 200W
Washington, DC 20001
Telephone: (202) 847-4400
prf@outtengolden.com

1

2      /s/ Nina Martinez
       Nina Martinez (pro hac vice)
3      OUTTEN & GOLDEN LLP
       685 Third Avenue, 25th Floor
4      New York, NY 10017
       Telephone: (212) 245-1000
5      nmartinez@outtengolden.com

6      /s/ Thomas G. Jarrard
       Thomas G. Jarrard
7      LAW OFFICE OF THOMAS G. JARRARD,
       PLLC
8      1020 N. Washington Street
       Spokane, WA 99201
9      Telephone: (425) 239-7290
       TJarrard@att.net

10

11     /s/ Matthew Z. Crotty
       Matthew Z. Crotty
12     CROTTY & SON LAW FIRM, PLLC
       905 W. Riverside Ave., Suite 409
       Spokane, WA 99201
13     Telephone: (509) 850-7011
       matt@crottyandson.com

14

15     /s/ Michael B. Love
       Michael B. Love
16     MICHAEL B. LOVE LAW FIRM, PLLC
       905 W. Riverside Ave., Ste. 404
17     Spokane, WA 99201
       Telephone: (509) 309-2787
       mike@michaellovelaw.com

18
       Attorneys for Plaintiff and Proposed Class
19

20

21

1

## **CERTIFICATE OF SERVICE**

2          I certify that on October 30, 2018 I caused the forgoing to be electronically

3    filed with the Clerk of the Court using the CM/ECF system, which sent notification

4    of such filing to the all counsel of record.

5                                   */s/ Peter Romer-Friedman*
                                   Peter Romer-Friedman *(pro hac vice)*
6                                   OUTTEN & GOLDEN LLP
                                   601 Massachusetts Ave NW, Suite 200W
7                                   Washington, DC 20001
                                   Telephone: (202) 847-4400
8                                   prf@outtengolden.com

9

10

11

12

13

14

15

16

17

18

19

20

21